IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

WILLIAM CURTIS THOMPSON                                                    PLAINTIFF

V.                                   CASE NO. 5:19-CV-05110

NURSE KELLEY HINELY; CARLA
CINK, Food Prep Supervisor;
SHERIFF TIM HELDER, Washington County,
Arkansas; DUSTIN SANDERS; and
NURSE VERONICA DOCKERY                                                     DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This is a civil rights action filed by Plaintiff William Curtis Thompson pursuant to 42
U.S.C. § 1983.   Thompson proceeds *in forma pauperis* and *pro se*.   The events at issue
in this case occurred while Thompson was detained in the Washington County Detention
Center ("WCDC").   Thompson contends his constitutional rights were violated when he
was denied his prescribed medication and a diabetic diet and when he was subjected to
unconstitutional conditions of confinement.

The case is before the Court on three motions for summary judgment.   First,
Thompson has moved for summary judgment in his favor (Doc. 73).   Second, Separate
Defendant Carla Cink has filed a Motion for Summary Judgment (Doc. 80).   Finally, the
Washington County Defendants, namely, Nurse Hinely, Sheriff Helder, Dustin Sanders,
and Nurse Dockery, have filed a Motion for Summary Judgment (Doc. 82).   The Motions
are ready for decision.

## I. BACKGROUND

Thompson was booked into the WCDC on May 11, 2019, following his arrest on
pending criminal charges.   He remained incarcerated there until May 20, 2019, when he

was released on bond.

In an intake questionnaire, it was noted that Thompson had a heart condition, had been diagnosed with diabetes, and took both heart medication and insulin.[1]   (Doc. 79-4 at 5).   The only notation regarding diet restrictions was that Thompson should be on a "no salt" diet.   *Id.* at 6.   Thompson testified at his deposition that during his medical intake screening, he told an unidentified male nurse that he needed his medications, including Apidra, Lantus insulin, an unspecified hypertension medication, Flexeril, hydrocodone, and niacin.   (Doc. 79-2 at 3; Doc. 79-4 at 4).   Thompson did not have his medications with him when he was arrested.

While Thompson testified that he was disabled due to a back condition, there is no mention of him having back problems in his WCDC records.   (Doc. 84-6 at 9).   Thompson testified that he has had back trouble since 1977, when he injured his back lifting a heavy piece of equipment.   *Id.* at 9.   Thompson also testified that he has been taking Flexeril and hydrocodone for his back for fifteen to twenty years.   *Id.* at 10.   He explained that at some point in 2019, he was forced to change doctors and that his new doctor refused to prescribe Thompson hydrocodone.   *Id.* at 17.

Thompson was diagnosed with diabetes in 1996.   He testified that he takes insulin three times a day and tests his blood sugar before he takes insulin.   *Id.* at 11.

Thompson claims he had triple heart bypass surgery in 2009.   He indicated that he has been taking Isosorbide for his heart since that time.   *Id.* at 12–13.   His

---

[1] Thompson testified at his deposition that when he was booked in, he did not tell jail personnel that he was diabetic and had a heart condition because they already had a record of it from his prior incarceration.   (Doc. 84-6 at 20).   Thompson testified that he was not asked about his medical issues.   *Id.* at 21.

cardiologist also had him on Plavix but discontinued it in September of 2019 and put him on aspirin. *Id.* at 14. Thompson testified that he had been taking Carvedilol and one other medication for his blood pressure since 2009, as well as niacin and furosemide, a diuretic. *Id.* at 14–15.

Kelley Hinely is a licensed nurse practitioner ("APRN"). (Doc. 84-7 at 1). She is employed by Karas Correctional Health Care ("Karas"), the health care provider for the WCDC. *Id.* According to APRN Hinely:

> The medical protocol for medication staff in the [WCDC] is to initially place all insulin dependent diabetics on sliding scale insulin ["SSI"] based on blood sugar checks to monitor and treat until medication reconciliation and review are complete. The provider (medical staff with prescribing authority) will reconcile and review the documented blood sugar levels to determine what insulin regimen or diet changes will best work with the detainee in the controlled environment.

*Id.* at 4; *see also* Doc. 84-8 at 4.

Dustin Sanders is a certified paramedic employed by Karas at the WCDC. (Doc. 84-10 at 1). As a paramedic, Sanders indicated he "may be scheduled to work at the [WCDC] during hours where a provider may not be available, such as nights or weekends." *Id.* at 2. As part of his duties, Sanders "may assist in reconciling a new detainee's medications by reviewing the intake questionnaire and by contacting any pharmacy or physician/clinic identified by the detainee during the questionnaire." *Id.* Sanders performed the reconciliation or verification of Thompson's prescriptions by calling the pharmacy he identified. *Id.* at 2–3; *see also* Doc. 79-4 at 4. Jail staff ultimately determined that Thompson had been prescribed Lantus (40 units), Clopidogrel (75 mg.), and Apidra insulin (10 units before meals). (Doc. 84-10 at 3). According to Sanders, "Thompson reported no other medications and no other medications were

3

indicated by his reported pharmacy." *Id.* As there were no diet restrictions identified during booking, Sanders asserts that "whether or not to place [Thompson] on a special diet at a later time would be determined by a review of his medical records including blood sugar readings." *Id.* Sanders asserts that "[m]edical personnel such as [myself] are available at any time a detainee asks to be seen for any reason." *Id.* at 4.

Veronica Dockery is a Physician's Assistant ("PA") employed by Karas and working at the WCDC. (Doc. 84-8 at 1). PA Dockery indicates that she does not consult with Sheriff Helder "regarding any medical decision or treatment for an inmate under my care." *Id.*

Thompson's medical file indicates that on May 12, 2019, the day after he was booked into the WCDC, Thompson was prescribed a blood sugar check before each meal and two units of SSI (regular or NovoLog). (Doc. 79-4 at 3); *see also* Doc. 84-7 at 5. He received SSI once in the evening on the 12th. (Doc. 84-7 at 5).

PA Dockery states that on May 13th, she reviewed the medication reconciliation and decided not to continue Apidra insulin since "Thompson had already been placed on sliding regular insulin which is in the same category of rapid/short acting insulin." (Doc. 84-8 at 5). She started Thompson on Lantus (long-acting) insulin and Clopidogrel, which had to be ordered from a pharmacy. *Id.* PA Dockery indicates that she "was not aware of Thompson receiving any other medications as he did not inform any medical staff of other medications. He did not notify any one that he was taking Isosorbide Mononitrate ER, furosemide[,] Hydrochlorothiazide, or Carvedilol, and his pharmacy did not report any of those medications." *Id.* According to PA Dockery, "If a new intake reports diabetes or hypertension, medical staff has standard medications available for use ('floor stock') in

4

emergencies." *Id.* at 7.   PA Dockery notes that Thompson was seen multiple times a day for blood sugar monitoring and medication distribution.   *Id.* at 8.

On May 13th, Thompson received SSI in the morning and afternoon.   *Id.* at 6. Thompson received Lantus on the evening of May 13th.   (Doc. 84-4 at 13).   On May 14th, the Lantus was discontinued, and 70/30 insulin was prescribed instead.   (Doc. 79-4 at 1).   Thompson was to receive 26 units in the morning and 14 units in the evening. *Id.*   A prescription was also added changing the frequency of blook sugar checks from before each meal to only before the morning and evening meals.   *Id.* at 2.   APRN Hinely indicates that she changed Thompson to 70/30 insulin based on her review of Thompson's "pharmacy history and blood sugar readings." (Doc. 84-7 at 7).   APRN Hinely states that in her experience "70/30 insulin is a therapeutic substitute for diabetics and works very well in the controlled environment of the detention center.   No changes to his diet appeared to be warranted at that time based on the records." *Id.*   In APRN Hinely's opinion, "[n]either a sack lunch, snacks, nor a diet change was indicated or needed to control [Thompson's] blood sugar based on his blood sugar readings while in the [WCDC]." *Id.* at 9.   With the exception of the days Thompson refused the medication, he continued to receive 70/30 insulin and Clopidogrel, as well as having regular blood sugar checks, each day until he was released.   (Doc. 79-4 at 7-8).

APRN Hinely notes that housing areas are equipped with intercoms so detainees or officers may report emergencies or seek immediate help.   (Doc. 84-7 at 10). "[M]edical staff (paramedics) are available at all times and established medical protocols are available to follow." *Id.*   APRN Hinely indicates that "[t]here is no record that Thompson suffered any medical emergency or that any symptoms of an emergent need

such as a heart attack or stroke were seen, reported, or identified in any way while [Thompson] was incarcerated in the [WCDC]." *Id.* Moreover, APRN Hinely notes that Thompson "had direct access to a medical professional two or three times per day during his blood sugar checks and insulin and medication distribution." *Id.* at 11.

Thompson testified that if he did not take his insulin, he felt weak. (Doc. 79-2 at 2). He stated that he started feeling weak after about three days of being in the WCDC. *Id.* Thompson also indicated there was a day when he could not see clearly. (Doc. 84-6 at 46–47). Thompson testified he would go down to get his medication in the morning, and he would start stumbling backwards when he reached the bottom of the stairs. (Doc. 84-6 at 33). In fact, Thompson indicated he still sometimes stumbles and falls. *Id.* Thompson testified that Dr. Coker has referred him to Benchmark Rehab Partners for falls and imbalance. *Id.* at 33–34. Thompson has not been told that his problem with imbalance is related to not having insulin for several days. *Id.* at 34.

Thompson testified that about a day or two after he talked to an unidentified male nurse at the WCDC, he began receiving his Plavix prescription. (Doc. 79-2 at 2). Despite what is indicated in his medical records, Thompson testified that he did not believe he received any insulin until May 15th or 17th. (Doc. 84-6 at 22-23). When he did receive insulin, he claims it was not what he had been prescribed but was a different kind of insulin "70/30." *Id.* Thompson testified that at most he received insulin for three or four days while at the WCDC. *Id.* at 31–32.

To obtain non-emergency medical health care at the WCDC, inmates are required to submit a medical request via the electronic kiosk available to inmates. (Doc. 79-7 at 9). Similarly, all general requests and grievances were to be submitted via the kiosk.

*Id.* at 19.  "All decisions [at the WCDC] regarding medications, medical testing, or medical treatment are left to the professional medical judgment of the medical staff and providers."  (Doc. 84-1 at 2); *see also* Doc. 84-7 at 1-2.

Thompson testified that he did not know how to operate the kiosk because he was not computer literate, but he was able to get help from someone who knew how.[2]  (Doc. 79-2 at 4; Doc. 84-6 at 24-25).  He never asked the person assisting him to submit a medical request for him.  (Doc. 79-2 at 4).  However, he does believe that on one occasion he had someone try to contact the nurse about his medication.  *Id.*  He does not believe he ever reported through the kiosk that his diet was incorrect, nor did he ask for a medical diet.  *Id.* at 4 & 8.  Thompson felt that jail's failure to provide him with a medical diet may have increased his hypertension.  *Id.*  Thompson reported that several weeks after his release, when he was seen by Dr. Coker, he was treated for hypertension. *Id.*

The requests made by Thompson, or on his behalf, through the kiosk have been provided to the Court.  (Doc. 79-5 at 1-8).  Among other things, Thompson asked for a welfare check on his girlfriend, to talk to a sergeant, what his bond was, how to release funds to a person, that adult protective services place his girlfriend into Homestead Rehabilitation Center, and to obtain certain phone numbers from his phone.  *Id.*

During May of 2019, Carla Cink was the Food Service Director at the WCDC. (Doc. 79-1 at 1).  She was employed by Summit Food Service, the contract food service provider for the WCDC.  *Id.*  According to Cink, "[A]ll inmates were given 'inmate

---

[2] During an incarceration in May of 2017, Thompson also submitted both general requests and medical requests via the kiosk.   (Doc. 84-3 at 3-4).

population food' unless the medical staff from the [WCDC] informed Summit Food Service or [me] of an individual inmate's dietary needs."  *Id.*  Cink indicates that neither Summit Food Service nor she "received any documentation showing or stating [Thompson] was in need of a special diet."  *Id.*  Thompson was not on the list of inmates receiving a special diet.  (Doc. 81-8)

Thompson testified that he received food but knew that "[i]t more than likely had salt and stuff like that in it."  (Doc. 79-2 at 5).  He just assumed that it was for "regular individuals" and was "not a diabetic diet."  *Id.*  He did tell an officer at the pod door that he was not supposed to eat a regular diet.  *Id.*  The officer responded that Thompson should get on the kiosk and let them know.  *Id.* at 6.  Thompson did not ask anyone to help him with the kiosk.  *Id.*  Instead, he "just left it like it was."  *Id.*  He felt it should have been in his record from a prior incarceration that he needed a diabetic diet.[3]  *Id.*

Thompson has no evidence that shows Cink was ever told he should be receiving a diabetic diet.  (Doc. 79-3 at 3).  Thompson concedes that if food service personnel were unaware of his need for a diabetic diet, he would never receive it.  *Id.* at 4.  He never told any of the officers that he was having a problem with the food trays given him.  *Id.* at 6.  He did not decline any food given him.  *Id.*  Thompson never told a supervisor or anyone associated with the food service company that he was having a problem with the food he was being given.  *Id.*

Thompson testified that the WCDC was overcrowded and that he had to sleep and eat on the floor for the entire ten-day period he was in there.  (Doc. 84-6 at 35).

---

[3] On February 15, 2016, Thompson was booked into the WCDC and released the same day.  (Doc. 84-2 at 2-4).  Thompson was again booked into the WCDC on May 20, 2017, and remained incarcerated there until May 30, 2017.  *Id.* at 5-8.

Thompson did have a mat to sleep on. *Id.* Thompson indicated that it was so overcrowded, any seats during meal times were claimed by other inmates, forcing him to sit on the steps or the floor. *Id.* Thompson believes Sheriff Helder was responsible for the overcrowding. *Id.* Thompson never complained about having to sleep on the floor or eat on the stairs. *Id.* at 37. He never asked an inmate to put anything on the kiosk about this situation. *Id.* Thompson never talked to Sheriff Helder. *Id.* Thompson testified he believed Sheriff Helder was liable because he was the sheriff. *Id.* Thompson believed Sheriff Helder knew inmates were sleeping on the floor because he could "look at his rosters up there and see if all his beds are full or not:" *Id.* at 37-38. With respect to the official-capacity claim, Thompson testified that the only custom or policy he could think of was that he was not getting his medication and proper food. (Doc. 84-6 at 42).

By affidavit, Sheriff Helder indicates he employs "a chain of command to supervise the employees of the various divisions of the sheriff's department. . . . The detention center chain of command is headed by Major Randall Denzer." (Doc. 84-9 at 1). Sheriff Helder states that he counts on the chain of command to oversee operations and to implement the policies and procedures he has adopted. *Id.* He is "not personally involved in the daily operations within the detention center including, but not limited to medical treatment, decisions, or distribution, or housing decisions." *Id.* Sheriff Helder notes that the primary medical care provider is the jail medical provider, in this case Karas. *Id.* at 2. Sheriff Helder indicates the WCDC is "operated in such a way to provide a clean and healthy environment . . . maintained through daily hygiene and sanitation practices. Detainees are provided mats, clothing, hygiene supplies, cleaning supplies, adequate

food, and an opportunity to exercise." *Id.* at 2-3.

Sheriff Helder states that he did not speak to or see Thompson while he was incarcerated in the WCDC in May of 2019. (Doc. 84-9 at 3). Sheriff Helder further indicates that he was not aware of Thompson's medical needs nor consulted about his treatment or diet. *Id.* Further, Sheriff Helder states he was "not aware that [Thompson] was made to sleep or eat on the floor." *Id.* WCDC policy is that "all inmates have a right to humane treatment which provides for nourishing food, access to medical and dental care when indicated, clean living quarters, and a healthy, safe, and secure environment." (Doc. 84-1 at 3).

Thompson maintains that APRN Hinely failed to give him his prescribed insulin. (Doc. 84-6 at 39). Thompson testified that it was not always the same nurse at the medication cart. *Id.* The only nurse Thompson talked to about his medication was an unidentified male nurse at the time Thompson was booked into the WCDC. *Id.* at 40. Thompson believes the supervisory or charge nurse should be held liable because he was not getting his "medicine and proper insulin." *Id.*

Medical records indicate that Thompson was admitted to Washington Regional Medical Center on January 25, 2020, and remained hospitalized until January 27, 2020. (Doc. 74 at 27). His chief complaints were of numbness and tingling in his left hand, weakness in his right leg, and facial droop for two to three days. *Id.* at 27. He reported leg pain that sometimes switched to the left leg, started near his groin, and radiated down. *Id.* Thompson was diagnosed as having suffered an "[a]cute cerebrovascular accident (CVA), associated with history of brainstem CVA in 2017, with residual R sided weakness." (Doc. 86-1 at 40).

## II.  LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The same standard applies where, as here, the parties have filed cross-motions for summary judgment. When no material facts are in dispute, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978). Each motion should be reviewed in its own right, however, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.   "They must show there is sufficient evidence to support a jury verdict in their favor."  *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).   "When

opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   DISCUSSION

As noted above, Thompson contends his constitutional rights were violated when he was denied his prescribed medication and a diabetic diet and when he was subjected to unconstitutional conditions of confinement.   All parties have moved for summary judgment on each claim.

### A.   Denial of Medical Care

Jail officials violate the Due Process Clause of the Fourteenth Amendment when they exhibit deliberate indifference to a pretrial detainee's objectively serious medical needs.  *See Ivey v. Audrain Cnty.,* 968 F.3d 845, 848 (8th Cir. 2020).   To succeed on this type of claim, a plaintiff must demonstrate that he had an objectively serious medical need and that the defendant actually knew of but deliberately disregarded that need.  *Id.* (citing *Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020)).

### 1.   Defendants PA Dockery, APRN Hinely, and Sanders

Thompson has failed to show the existence of any genuine issue of material fact as to whether any of these Defendants acted with deliberate indifference to his serious medical needs.   The pharmacy Thompson identified at intake was contacted, and his medications were verified.   It was determined that Thompson had been prescribed Lantus (40 units), Clopidogrel (75 mg.), and Apidra insulin (10 units before meals).   Thompson did not identify any other medications at the time of intake; he identified no

other pharmacies; and he never submitted a medical request asking for additional medication.   After Thompson became incarcerated, his medical care provider was Karas and its medical staff.   Thompson's blood sugar levels were consistently checked.   He was given insulin each day.   He began to receive his Clopidogrel prescription as soon as it was verified and obtained from the pharmacy.

Thompson concedes he never put in a medical request or grievance about his medical treatment.   Although he indicates he could not use the kiosk, he had other inmates willing to submit entries for him and in fact submitted several requests about other subjects.   He never used the intercom to seek medical attention.   He was seen by medical staff at least twice a day—when his blood sugar checks were performed and when he received his medication.   Though Thompson contends that Sanders must have seen him stumbling at the bottom of the stairs during medication distribution—and should have taken independent action to provide medical attention—Thompson does not contend he spoke directly to Sanders about his problems with balance or his belief that he had an ischemic attack.   *See* Doc. 74 at 11.   Accordingly, the Court finds that there is no evidence to indicate that Sanders, PA Dockery, or APRN Hinely was deliberately indifferent to Thompson's serious medical needs.   All claims against them are subject to dismissal.

With respect to claims against Cink concerning Thompson's diet, it is undisputed that Thompson never requested that he be prescribed a diabetic diet.   Further, the medical staff saw no need to place him on a diabetic diet.   It is also undisputed that medical staff were responsible for determining whether a special diet should be prescribed to Thompson.   Even then, the provision of the diabetic diet had to be

approved by the dietician before an inmate was placed on the special diet list.[4]   Cink had

no input into these decisions.   Despite Thompson's contention otherwise, Cink had no

obligation to determine whether any inmate, including Thompson, should be placed on a

special diet.   Thompson did not ask Cink, or anyone else for that matter, how to go about

being placed on a diabetic diet.   Accordingly, the claims against Cink are subject to

dismissal.

### 2.   Sheriff Helder—Individual-Capacity Claim

With respect to Sheriff Helder, it is well established that individual liability under

§ 1983 must be based on personal involvement.   *Ashcroft v. Iqbal*, 556 U.S. 662, 676

(2009).   "Liability under section 1983 requires a causal link to, and direct responsibility

for, the deprivation of rights.   To establish personal liability of the supervisory

defendant[s], [Thompson] must allege specific facts of personal involvement in, or direct

responsibility for, a deprivation of [his] constitutional rights."   *Clemmons v. Armontrout*,

477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th

Cir. 2006)); *see also Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) ("[G]eneral

responsibility for supervising the operations of a prison is insufficient to establish personal

involvement required to support [§ 1983] liability.").   Thompson concedes he had no

interaction with Sheriff Helder.   It is undisputed Thompson never took any action

designed to ensure that Sheriff Helder was aware of Thompson's claims that he was

---

[4] WCDC policy "D7.0 Food Service" with respect to medical diets provides that "if a nurse or doctor orders a special diet for a detainee, for medical reasons, the diet must be approved by the dietician."   (Doc. 79-8 at 11).   Further, it provides that "[a]ll special diets shall be posted in the kitchen area."   *Id.*

being denied prescribed medication and a diabetic diet.   Absent some type of personal involvement, Sheriff Helder simply cannot be held liable.

### 3.   Official-Capacity Claim

Finally, Thompson asserts an official-capacity claim.   An official-capacity claim is lodged against the employing governmental entity, here, Washington County.   *Crawford v. Van Buren Cnty.*, 678 F.3d 666, 669 (8th Cir. 2012).   "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise."   *Corwin v. City of Independence, Mo.,* 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted).   "A policy is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."   *Hayes v. Faulkner Cnty.,* 388 F.3d 669, 674 (8th Cir. 2004) (internal quotation marks and citation omitted).   To constitute a custom the alleged unconstitutional conduct must be "continuing, widespread, and persistent."   *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

Thompson does not contend that any WCDC policy was unconstitutional. Instead, he argues that the County Defendants failed to follow the policies of the WCDC with respect to the provision of medical care and a special diet.   Further, since the Court has found that Thompson's rights have not been violated, there is no basis for official capacity liability.   *Whitney v. City of St. Louis, Mo.,* 887 F.3d 857, 861 (8th Cir. 2018) ("[A]bsent a constitutional violation by a city employee, there can be no § 1983 or *Monell*

liability for the City."). The official-capacity claim concerning the provision of medical care and a special diet is therefore subject to dismissal.

### B. Unconstitutional Conditions of Confinement

Thompson was a pretrial detainee. In the past, the Eighth Circuit, although recognizing a pretrial detainee's claims were properly analyzed under the Fourteenth Amendment, had applied the Eighth Amendment's deliberate-indifference standard to conditions-of-confinement claims brought by pretrial detainees. *See, e.g., Davis v. Oregon Cnty.*, 607 F.3d 543, 548 (8th Cir. 2010) ("Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment.") (internal quotation marks and citation omitted). However, in *Stearns v. Inmate Servs. Corp., et al.,* 957 F.3d 902 (8th Cir. 2020), the Eighth Circuit clarified that, despite some prior inconsistencies in its cases, the deliberate indifference standard did not apply to conditions-of-confinement cases brought by pretrial detainees.[5] In *Stearns,* the Eighth Circuit clarified that the claims of pretrial detainees must be analyzed under the Fourteenth Amendment as set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979). In *Bell,* the Supreme Court stated that "the proper inquiry is whether [the] conditions amount to punishment of the detainee." 441 U.S. at 535.

Interpreting *Bell,* the Eighth Circuit explained:

> [T]he government may detain defendants pretrial and "may subject [them] to the restrictions and conditions of [a] detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." The Court articulated two ways to determine whether conditions rise to the level of punishment. A plaintiff could show that the conditions were intentionally punitive. Alternatively, if there is no expressly demonstrated intent to punish, the plaintiff could also show that the conditions were not reasonably related to a legitimate governmental

---

[5] Defendants utilize the deliberate indifference standard in their brief. (Doc. 27 at 6-11).

> purpose or were excessive in relation to that purpose.   If conditions are
> found to be arbitrary or excessive, it is permissible to "infer that the purpose
> of the governmental action is punishment that may not constitutionally be
> inflicted upon detainees *qua* detainees."

*Stearns*, 957 F.3d at 907 (alterations in original) (internal citations to *Bell* omitted).

Thompson contends that having to sleep on a mat on the floor and having to eat

on the floor or on the steps from May 11th until his release on May 20th violated his

constitutional rights.   He does not argue that the medical staff were involved in any way

in the decision about where he should be housed.   Further, the medical record from the

WCDC does not reflect any complaints from Thompson to the medical staff about low

back pain, and he never requested an extra mat or to be moved to a cell with a bunk for

medical reasons.

The Court finds that requiring Thompson to sleep on the floor with a mat for ten

days did not constitute punishment.   As noted above, Defendants were unaware of

Thompson's back condition, and he made no effort to inform them that sleeping on the

floor was causing him physical problems.   *See, e.g., Hamilton v. Mauldin*, 2015 WL

898080, at *2 (W.D. Ark. Mar. 3, 2015) (requiring inmate to sleep on floor without a

mattress and with only a blanket and two sheets for seven or eight nights was not a

constitutional violation) (citing *O'Leary v. Iowa State Men's Reformatory*, 79 F.3d 82, 84

(8th Cir. 1996) (inmate forced to spend four days sleeping on a concrete slab without a

blanket or mattress did not state a constitutional violation)); *Williams v. Delo*, 49 F.3d 442

(8th Cir.1995) (holding that four days without water, a mattress, bedding, clothing, legal

mail, or hygienic supplies did not violate the Eighth Amendment); *see also Desroche v.*

*Strain*, 507 F. Supp. 2d 571, 579–80 (E.D. La. 2007) (sleeping on the floor in a crowded

holding tank for ten days failed to state a constitutional violation because the conditions

17

were temporary, and the short duration did not result in sufficiently serious conditions posing a substantial risk of serious harm to the inmate) (citation omitted).

With respect to the alleged overcrowding, it is well settled that "overcrowding alone is insufficient to create a due process violation." *A.J. by L.B. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995). For a violation to exist, the overcrowding must have "led to deprivations of essential food, medical care, or sanitation" or have led to an increase in inmate violence. *Patchette v. Nix*, 952 F.2d 158, 163 (8th Cir. 1991) (citation omitted). In evaluating overcrowding claims, the courts look to a number of factors, including the size of the living space, the length of time spent in the cell each day, the length of confinement, and the opportunity for exercise. *Kierst*, 56 F.3d at 855. Here, Thompson was exposed to overcrowded conditions for a short duration. He makes no allegation that he was deprived of food, clothing, hygiene items, or exercise during this time.

For all of these reasons, the Court finds that Thompson has failed to set forth facts that would constitute unconstitutional conditions of confinement, and this claim is subject to dismissal.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 73) is **DENIED**; Defendant Carla Cink's Motion for Summary Judgment (Doc. 80) is **GRANTED**; and the Motion for Summary Judgment (Doc. 82) filed by APRN Kelley Hinely, Sheriff Helder, Dustin Sanders, and PA Veronica Dockery is also **GRANTED.** This case is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** on this 29th day of October, 2020.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE